[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-11664

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 24, 2006
THOMAS K. KAHN
CLERK

DOL Nos. ARB 04-168 & ALJ 99-JTP-16

FLORIDA AGENCY FOR WORKFORCE INNOVATION,

Petitioner,

versus

UNITED STATES DEPARTMENT OF LABOR,

Respondent.

_____

Petition for Review of a Decision of the
Department of Labor

_____

**(April 24, 2006)**

Before CARNES, WILSON and PRYOR, Circuit Judges.

PER CURIAM:

Appellant Florida Agency for Workforce Innovation ("Florida")[1] petitions for review of the United States Department of Labor ("DOL") Administrative Review Board's ("ARB") decision disallowing $11,419,499 in federal funds granted to Florida under the Job Training Partnership Act ("JTPA"), Pub. L. No. 97-300, 96 Stat. 1322 (codified as amended at 29 U.S.C. § 1501 et seq.) (repealed 2000). Pursuant to an audit conducted by the DOL's Office of Inspector General ("OIG"), a DOL Grant Officer ("GO") determined that Florida's expenditure of the federal monies did not comport with JTPA requirements, and therefore disallowed the entire $11.4 million. Florida then sought a hearing before a DOL administrative law judge ("ALJ"), who ultimately reversed the GO's decision and found that Florida had expended the JTPA funds lawfully. The ARB, however, accepted DOL's petition for further review and reversed the ALJ, affirming the GO's decision to disallow and recover the $11.4 million. Florida now petitions this Court to reverse the ARB's decision, arguing that the decision misconstrued statutory language, was not supported by substantial evidence, and deprived Florida of due process. We deny the petition and affirm the ARB.

## I. BACKGROUND

---

[1] Petitioner is the successor agency to the Florida Department for Labor and Employment Security, which was the pertinent state entity during much of the relevant time period in this case. We intend the term "Florida" to encompass both Petitioner and its predecessor.

In the mid-1990s, DOL's Employment and Training Administration ("ETA") granted the State of Florida millions of dollars in JTPA federal funds to assist disadvantaged youths (Title II) and retrain dislocated workers (Title III). Forty percent of these monies were held in a discretionary "Governor's Reserve" fund administered at the state level.[2] Florida then used a portion of these reserve funds, in combination with lottery funds and general revenues, to support its Performance Based Incentive Fund ("PBIF"). PBIF, a state program developed in 1994, was designed to reward community colleges and school district programs for retraining certain qualified students, including JTPA Title III eligible "dislocated workers." *See, e.g.*, Fla. Stat. Ann. § 239.249(3) (1995) (repealed 2000). Participating colleges and school districts received various "incentive" payments as their eligible students met certain performance benchmarks (e.g., enrolling, completing certain courses and finding placement in higher-paying jobs). *See id.* These payments increased for each successive level of performance reached, and were higher for an eligible JTPA dislocated worker or other qualified student, as opposed to a general student.[3]

---

[2] Florida allocated the other 60% of the funds among several local service delivery areas known as Regional Workforce Development Boards ("RWDBs") or Private Industry Councils ("PICs"), which used the funds to recruit dislocated workers to enroll in community college and school district retraining programs, and to pay their annual tuition. The GO did not challenge Florida's expenditure of these JTPA Title III funds.

[3] In 1994, Florida asked ETA to review the draft PBIF legislation. DOL Assistant Secretary Doug Ross responded with a letter cautioning that "the procurement of any services

When PBIF was initiated, Florida law capped the amount of a student's annual tuition at 10% or 25% of the prior year's cost of completion, depending upon the program involved. *See* Fla. Stat. Ann. § 239.117(4)(a), (5)(a) (1994). Florida would then attempt, on an annual basis, to calculate the amount of funds necessary to cover the projected remainder of students' instructional costs, though the state legislature had the final say on actual appropriations. Sometimes this calculation used the previous year's number of full time equivalent ("FTE") students and was based on the average instructional cost per FTE student. If an entity's portion of appropriated funds proved insufficient to cover the remaining costs incurred during a given year, the entity would not be appropriated additional funds to cover the excess costs.[4] Although PBIF payments were not factored into the annual appropriations, an entity could not receive PBIF payments until (1) it had exhausted its state appropriated funds, and (2) its level of performance (enrollments, course completions, and placements) in serving qualified students matched the level of performance from the base year (i.e., the year before PBIF's

_____

utilizing federal funds" would have to comply with § 164 of the JTPA and applicable regulations (i.e., the services purchased had to be "reasonable and cost effective"), duplicate payments would not be allowed, and JTPA Title III reporting and record keeping requirements would apply with respect to eligible dislocated workers who received Title III funded services.

[4] Community colleges were required to admit all applicants, regardless of whether the appropriations were sufficient. Once school districts and community colleges exhausted their annual appropriations, they could still charge any additional students (the "overcap" population) for the tuition portion of costs.

4

implementation).[5] Even though PBIF payments for targeted groups (such as eligible dislocated workers) were higher than for other groups, the payments were designed never to exceed the actual costs of instruction.

In 1996, ETA received complaints that Florida was not spending JTPA funds lawfully–namely, that PBIF was not using JTPA funds to provide any services to JTPA eligible students which were not already available to that group as a result of general state appropriations. At ETA's request, OIG audited PBIF program activities from March 1, 1995 through June 9, 1998. OIG's audit report concluded that PBIF payments violated the JTPA in three principal ways: (1) funds were not used "for activities which are in addition to those which would otherwise be available in the area in the absence of such funds," as required by JTPA § 141(b), because schools "received incentive payments for serving JTPA participants, yet did not provide them with instruction or assistance distinguishable from that available to the general student population"; (2) costs were not "necessary and reasonable for proper and efficient administration of the program," as required by JTPA § 164(a)(2)(A), because the State was already obliged to cover the non-tuition costs of JTPA eligible students; and (3) funds were used to improve programs available to all students who met enrollment requirements, but

_____

[5] In addition, PBIF participants were required to put a portion of their annual appropriations "at risk" by placing that portion in the PBIF fund and then "earning" it back before receiving any additional PBIF monies.

JTPA § 164(a)(2)(C) requires that costs "not be a general expense required to carry out the overall responsibilities of State . . . governments . . . ."

In response, Florida asserted that the auditors were operating under two misconceptions:

> First of all, PBIF was never intended to fund special services for any sub-set of its clientele . . . . Great pains are taken within Florida's educational programs to treat students equally and equitably and not to label and stigmatize students with an association to this program or that program. Who pays for the tuition, the transportation to get the student to class, or the day-care for the student's child is transparent to the instructor. . . . The second misperception that the auditors held is that the state vocational education system has boundless capacity and that if the student has money for tuition from JTPA or whatever source, it is the obligation of the state to serve that student. Equal and equitable access to programs is an obligation of the state. Unlimited access is not. Vocational education in Florida is not an entitlement program.

The real benefits obtained by JTPA funds, Florida argued, are realized "not in tracking the individual dollars of any one source of revenue, but rather [in] examining the overall funding of Florida's vocational education program and that of PBIF." PBIF "expanded service capacity and program production of Florida's high skills/high wage programs," particularly "for JTPA Title III and other disadvantaged students." PBIF payments were neither unnecessary nor unreasonable, because they were constructed never to exceed the actual cost of service and were made only for successful performance by students. Finally, Florida argued, auditors should consider the following: (1) PBIF took advantage of

economies of scale, because the fixed costs of various programs were already covered by general revenue funding, and those programs could therefore be expanded at a lower variable cost rate; (2) PBIF payments were delayed during its first year in effect, so educational institutions had to cover costs with "loans" from budget areas "where payments could be deferred as capital outlay," which is why PBIF funds were later used to purchase equipment and meet other deferred general costs; and (3) PBIF encouraged educational entities to initiate or expand high skill/high wage programs by offering them up to $25,000 (in general revenue or lottery funding) if they were able to secure a private sector match by an employer who hired students from that high skill/high wage program.

OIG was not persuaded. Under Florida's own description of PBIF, the audit report replied, JTPA funds were not used specifically to assist eligible members of the requisite target groups. Given that JTPA-eligible students were "transparent," they were "entitled to have a share of their educational costs borne by the State, as occurred for others in the general student population." OIG also questioned Florida's suggestion that, but for PBIF, schools would not have been able to serve JTPA eligible students or obligated to refocus on high wage/high skill programs.[6]

---

[6] OIG further disputed the performance data presented in Florida's response, which showed considerable increases in enrollments, completions and placements for Title III eligible students from 1995-97. According to the audit report, Florida "counted students that enrolled in successive years," which essentially inflated enrollment counts. In fact, OIG stated, "discrete counts of the numbers of new JTPA students enrolling in vocational educational courses

Ultimately, the audit report recommended that ETA recover $11,419,499 in "misspent" JTPA funds.

Based on the audit report, the GO issued an Initial Determination ("ID") tentatively disallowing the $11.4 million. The ID stated in relevant part:

> The grantee's response to the draft audit report did not provide information to refute the auditors' position that the uses to which the PBIF program put JTPA funds were unallowable.
> . . . .
> The documentation provided is not sufficient to allow the costs. The audit has stated that the incentive payments were used to subsidized [sic] Florida's state and local adult educational costs. JTPA funds are to be used in addition to what is already available, not to carry-out [sic] the overall responsibilities of the State.

In response to the ID, Florida stressed that PBIF payments were structured so that the payments never exceeded actual costs, even for JTPA eligible participants. Florida also noted that "many of the schools detailed in writing things that were done to attract Title III eligible students." The GO's Final Determination ("FD") nevertheless reaffirmed the $11.4 million disallowance, responding to Florida's costs argument as follows: "Aggregate cost figures are inadequate as a basis for determining whether any of the questioned costs can be allowed. To document the allowability of these costs, the State must provide documentation of actual costs incurred and paid for with the JPTA Title III funds." (emphasis omitted). With respect to activities done to attract Title III students, the FD stated:

indicates the numbers declined."

> The documents that were provided suggest that some of these funds were spent on recruiters, brochures and fliers, as well as on the costs of creating or expanding curricula for high skill/high wage occupational skills training. A portion of these costs may very well be allocable to the Title III JTPA program. Before any costs can be determined to be allowable, the State must provide actual documentation of the costs incurred as well as the basis for allocating a portion of those costs to JTPA Title III.

(emphasis omitted).

Shortly after the FD issued, Florida sought a hearing on the disallowance before the ALJ. *See* 20 C.F.R. §§ 627.800(a), 627.801. DOL moved for a summary decision, making arguments similar to those raised by the OIG and GO. After conducting a hearing the ALJ denied the motion, stating that "both the supply side and the demand side must be evaluated in assessing, under Section 141(b), the 'availability' of an activity to the JTPA participant." Whether Florida's training courses were "available" to JTPA eligible persons in the absence of PBIF, the ALJ found, was a fact-dependent issue not amenable to summary decision. He then proceeded to conduct a three-day hearing, receiving into evidence numerous exhibits and the testimony of six witnesses. In July of 2004, the ALJ issued a lengthy decision reversing the GO's FD and allowing the $11.4 million in costs. At its heart, the ALJ stated, DOL's case rested upon an interpretation of JTPA §§ 141(b) and 164 that rendered PBIF's expenditure of JTPA funds inherently unlawful. The ALJ considered this interpretation too narrow in light of the

9

pertinent regulatory framework, which sought not merely to avoid duplicate or overlapping payments, but also to "ensure that the best mix of programs and funds is available to the JTPA participant." 59 Fed. Reg. 45,760, 45,767 (Sept. 2, 1994). While "essentially the same educational services were 'available' to dislocated workers before the State legislature adopted the PBIF program," the ALJ acknowledged, and the State did provide funds to cover non-tuition costs, before the creation of PBIF

> the State apparently lacked the focus on the particular target population Congress singled out for special attention in the JTPA. Thus, the level of "availability" as measured by the participation of dislocated workers in the pre-PBIF State system, including funding above tuitions, was not meaningful for the class of outsourced and dislocated workers Congress intended to benefit. Witnesses in this proceeding cited studies indicating that dislocated workers simply were not being re-trained and re-employed in significant numbers. The PBIF program, to a large extent, changed that. Considered in context, the "activity" in addition to those that were otherwise "available" in the area within the meaning of Sections 141(b) and 164 was the PBIF program itself.

Under this interpretation, and considering the safeguards employed by Florida, the ALJ concluded, Florida's PBIF expenditures did not violate §§ 141 or 164 of JTPA. Notably, the ALJ commented that "[d]ocumentation of individual costs as they related to individual levels of student achievement in moving through the process of re-training and finding a job or dropping out was not a focus of this proceeding."

10

DOL appealed the ALJ's decision to the ARB, which was authorized to render a final agency decision in the matter.[7] The ARB reversed the ALJ's decision, characterizing the overall issue as

> whether the evidence is adequate to establish that the JTPA Title III funds that Florida's PBIF disbursed provided services to Title III eligible students "in addition" to those services already provided to general students in accordance with JTPA Section 141(b) or were spent lawfully for the costs of instruction of Title III students that were 'necessary and reasonable' because they were not costs that state appropriated funds already covered in accordance with JTPA Section 164(a)(2)(A).

Reviewing the ALJ's decision de novo, the ARB concluded that Florida misspent JTPA Title III funds because "Florida's records are inadequate to show that JTPA Title III funds were spent lawfully pursuant to Sections 141(b) and 164(a)(2)(A)," and "Florida has not adduced convincing evidence to the contrary." Nor did Florida meet the burden of showing that the disallowed costs were otherwise expended for lawful JTPA purposes through other means, because "the record demonstrates that the JTPA Title III funds which Florida's PBIF disbursed were spent to fund costs or a 'general expense' that was the responsibility of the State and not for any specific JTPA purpose in violation of JTPA Section 164(a)(2)(C) .

---

[7] The JTPA allows a party dissatisfied with an ALJ's decision to request further review by the Secretary of Labor, within certain time limitations. *See* JTPA § 166(b), 29 U.S.C. § 1576(b) (1999). The Secretary has delegated to the ARB the authority and responsibility to resolve such matters. *See* 67 Fed. Reg. 64,272, 64,272 (Oct. 17, 2002).

. . ."[8] The ARB therefore ordered Florida to repay DOL the $11.4 million pursuant to 29 U.S.C. § 1574. Florida now petitions this Court to reverse the decision of the ARB.

## II. STANDARD OF REVIEW

The JTPA permits a party aggrieved by a final order of the Secretary "with respect to a corrective action or sanction imposed under section 1574 of [title 29]" to "obtain review of such final order in the United States Court of Appeals having jurisdiction over the applicant or recipient of funds." 29 U.S.C. § 1578(a)(1) (1999).[9] We have jurisdiction "to make and enter a decree affirming, modifying,

---

[8] The ARB noted that the ALJ did not "address or apply the relevant framework regarding the parties' evidentiary burdens in this case," as set forth in 20 C.F.R. § 627.802(e). The GO has a burden of production to offer prima facie evidence sufficient for a reasonable person to conclude that a recipient spent JTPA funds unlawfully. *See* 20 C.F.R. § 627.802(e); *Tex. Dep't of Commerce v. U.S. Dep't of Labor*, 137 F.3d 329, 332 (5th Cir. 1998). If the recipient's records are inadequate to show that it spent the JTPA funds lawfully, the GO meets his burden by establishing the inadequacy of evidentiary records. *Tex. Dep't of Commerce*, 137 F.3d at 332. If the GO carries this burden, the recipient challenging the GO's determination then has the burden of persuasion. *See* 20 C.F.R. § 627.802(e). Overcoming a prima facie case requires the grantee to present cogent evidence and argument on how it has either met the specific requirements imposed by the JTPA or otherwise compensated for any deficiencies. *See In re Massachusetts*, ARB Nos. 02-211, 02-201, 2002 WL 1482177, at *7 n.7 (Dep't of Labor June 13, 2002).

[9] The Workforce Investment Act of 1998 ("WIA"), 29 U.S.C. § 2801 *et seq*., repealed the JTPA effective July 1, 2000. *See* Workforce Investment Act, Pub. L. 105-220, § 199, 112 Stat. 936, 1058-59 (1998). Title 1 U.S.C. § 109, however, provides:

The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.

or setting aside the order of the Secretary in whole or in part." *Id.* at § 1578(b).

The scope of our review, however, is limited. *See State of La., Dep't of Labor v. U.S. Dep't of Labor*, 108 F.3d 614, 617 (5th Cir. 1997). Section 1578(a)(3) provides that "[n]o objection to the order of the Secretary shall be considered by the court unless the objection shall have been specifically and timely urged before the Secretary. Review shall be limited to questions of law and the Secretary's findings of fact shall be conclusive if supported by substantial evidence." 29 U.S.C. § 1578(a)(3).

## III. DISCUSSION

Florida seeks reversal on three principal grounds: (1) the ARB misconstrued JTPA § 141(b); (2) the ARB's decision is not supported by substantial evidence; and (3) the ARB improperly based its ruling on a theory of liability different than that advanced by DOL at the administrative hearing before the ALJ. We address these arguments in turn.

A. *Section 141(b)*

---

1 U.S.C. § 109. The parties do not identify, and we do not find, anything in the WIA that would release or extinguish any "penalty, foreiture, or liability" of Florida under the JTPA, or eliminate our jurisdiction to hear Florida's petition.

Where, as here, we review an agency interpretation of a statute that it is responsible for administering,[10] we apply the two-step test set forth in *Chevron U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 842-43, 104 S. Ct. 2778, 2781-82, 81 L. Ed. 2d 694 (1984). *See Sierra Club v. Johnson*, 436 F.3d 1269, 1274 (11th Cir. 2006). If Congress has directly spoken to the precise question at issue and its intent is clear from the statutory language, we must give effect to that unambiguously expressed intent. *See id.* However, if the statute is ambiguous or silent with respect to the specific issue, we simply decide whether the agency based its interpretation on a permissible construction of the statute. *See id.* "We need not conclude that the agency construction was the only one it permissibly could have adopted or even that we would have interpreted the statute the same way that the agency did." *Id.* (internal quotes omitted).

JTPA § 141(b) states:

**(b) No duplication of services**

Funds provided under this chapter shall only be used for activities which are in addition to those which would otherwise be available in the area in the absence of such funds.

29 U.S.C. § 1551(b) (1999). Florida challenges the ARB's determination that § 141(b) required Florida to show that PBIF "provided services to Title III eligible

---

[10] The JTPA empowers the Secretary of Labor to "prescribe such rules and regulations . . . as the Secretary deems necessary," and authorizes administrative adjudication by DOL. *See* 29 U.S.C. §§ 1576, 1579 (1999).

14

students 'in addition' to those services already provided to general students . . . ." According to Florida, the ARB's reading "changes the meaning of the statute from one which prohibits funding for activities currently available to JTPA participants from other funding sources, to a [sic] one which forbids any payments to JTPA participants for activities which, though never available to them, were previously available to general students." Florida's argument, DOL counters, rests on the false premise that JTPA eligible students were somehow excluded from the general student population prior to the creation of PBIF. In DOL's view, § 141(b) prohibits the use of JTPA funds for services that would have been available to a JTPA eligible student in the absence of JTPA funds. JTPA eligible students, DOL contends, were covered by state appropriated funds like any other general students, with access to the same services. Given that Florida nevertheless paid out JTPA funds (through PBIF) based on the enrollment and performance of Title III eligible students, DOL reasons, the ARB properly questioned whether those funds were used to provide a service to those students *beyond* what was already "available" to them by virtue of state appropriated funds.

This understanding of "availability," Florida responds, is too narrow. Florida points to the ALJ's determination that "the level of 'availability' as measured by the participation of dislocated workers in the pre-PBIF State system, including funding above tuitions, was not meaningful for the class of outsourced

15

and dislocated workers Congress intended to benefit." A proper construction of "availability," the ALJ argued, must include not merely the theoretical "supply side" availability of a given activity, but also "demand side" factors such as the likelihood that dislocated workers would pursue the activity in the absence of PBIF. He found that

> [i]n this instance, the dislocated worker population which traditionally was not served by the existing State funded adult education programs received a considerable boost by the PBIF program. Considering the term "availability" as used in Section 141(b) of the Act, it would be difficult to avoid concluding in a broader more meaningful sense that the PBIF program as a whole was an activity "in addition to" those which had had little success in serving the target population.

Florida also notes that the ALJ relied on pertinent regulatory materials in construing § 141(b). *See, e.g.*, 20 C.F.R. § 627.220(a) (stating that certain state and sub-state entities "shall establish coordination procedures and contractual safeguards to ensure that JTPA funds are used in addition to funds otherwise available in the area and are coordinated with these funding sources"); 59 Fed. Reg. 45,760, 45,767 (Sept. 2, 1994) ("The purpose of coordination requirements is to preclude duplicate or overlapping payments among Federal, State, and local programs to participants and training institutions and to ensure that the best mix of programs and funds is available to the JTPA participant.").

The ARB, however, rejected the ALJ's interpretation, emphasizing that "the PBIF program . . . was not the same as a JTPA program." PBIF, the ARB noted,

16

"commingled a variety of funds, only a portion of which included JTPA Title III funds, and disbursed 'incentive' payments to serve a variety of disadvantaged students, only a portion of whom were JTPA Title III dislocated workers." The disbursement of incentive payments from commingled funds to serve a variety of disadvantaged students, the ARB stated, "does not establish how the purpose of JTPA Section 141(b) Title III, to provide additional retraining services to dislocated workers, was served." In other words, the ARB read § 141(b) more narrowly than the ALJ, as requiring that JTPA Title III funds be used specifically to provide services to Title III dislocated workers that would not otherwise be available to those workers as a result of other funding.

Florida asserts that the language of § 141(b) unambiguously favors its position. We disagree, for § 141(b) is susceptible to several plausible constructions, depending upon how broadly or narrowly one interprets the terms "activities," "in addition to," and "would otherwise be available," none of which is defined by the JTPA. *See PDK Labs. v. U.S. D.E.A.*, 362 F.3d 786, 796 (D.C. Cir. 2004) ("That a statute is susceptible of one construction does not render its meaning plain if it is also susceptible of another, plausible construction . . . ."). Given this ambiguity, we must defer to the ARB's interpretation if it is based on a permissible construction of the statute. *See Sierra Club*, 436 F.3d at 1264. The ARB's interpretation meets this standard, for it does not exceed the bounds of the

17

statutory language, does not conflict with pertinent regulations, and accords with other funding restrictions set forth in the statute. As noted above, 20 C.F.R. § 627.220, which references § 141(b), requires the establishment of coordination procedures and contractual safeguards "to ensure that JTPA funds are used *in addition to funds otherwise available in the area* and are coordinated with these funding sources." 20 C.F.R. § 627.220(a) (emphasis added). Although the ALJ emphasized that this requirement was intended not merely to preclude "duplicate or overlapping payments," but also to ensure the "best mix of programs and funds," that "best mix" is meant for "*the JTPA participant*." 59 Fed. Reg. at 45,767 (emphasis added). The ALJ, however, found that PBIF satisfied § 141(b) even though the beneficiaries of PBIF funds were *not* necessarily JTPA participants. The ARB's interpretation avoids this inconsistency. Likewise, the ARB's interpretation of § 141(b) complements JTPA §§ 107(b) and 141(h), both of which prohibit the use of JTPA funds "to duplicate facilities or services available in the area . . . from Federal, State, or local sources, unless it is demonstrated that the JTPA-funded alternative services or facilities would be more effective or more likely to achieve performance goals . . . ." 20 C.F.R. § 627.420(a)(5) ; *see* 29 U.S.C. §§ 1517(b), 1551(h) (1999).[11]

---

[11] For example, under the ARB's interpretation § 141(b) prohibits a state from using JTPA funds to pay, on behalf of a JTPA Title III eligible dislocated worker, the costs of a retraining class at a state university when those costs are already covered by state appropriated

18

Florida insists that the ARB's reading of § 141(b) is unreasonable, because it ignores the "truism" that "[s]ervices cannot be deemed available to those who lack meaningful access to them."  As the ARB found, however, "[t]he [Regional Workforce Development Boards] used . . . JTPA Title III funds to recruit dislocated workers to enroll in community colleges and school district programs for retraining and to pay for their annual tuition costs."  DOL did not challenge these expenditures.  Thus, Florida's claim that dislocated workers lacked "meaningful access" to retraining services in the absence of PBIF assistance is unpersuasive.  Accordingly, we defer to the interpretation of the ARB.

B.     *Substantial Evidence*

Florida contends the ARB's decision that Florida misspent JTPA funds in violation of §§ 141(b) and 164(a)(2)(A) is not supported by substantial evidence. "'Substantial evidence' is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *State of La.*, 108 F.3d at 617 (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); *see Am. Tower LP v. City of Huntsville*, 295 F.3d 1203, 1207 (11th Cir. 2002) (explaining that traditional "substantial evidence" standard

---

funds.  JTPA §§ 107(b) and 141(h) then further prohibit the use of JTPA funds to establish an identical, separate retraining class for JTPA Title III eligible dislocated workers only, unless it is shown that such an action would prove "more effective or more likely to achieve . . . performance goals."  *See* 29 U.S.C. § 1517(b); 29 U.S.C. § 1551(h).

"requires more than a mere scintilla but less than a preponderance"). "[T]he mere fact that a different conclusion might be drawn from the evidence does not necessarily preclude a determination that an administrative decision was supported by substantial evidence." *State of La.*, 108 F.3d at 617. However, "when the Board does not accept the findings of an ALJ, the evidence and findings of the Board must be examined more critically than if the two had been in agreement." *NLRB. v. Ridgeway Trucking Co.*, 622 F.2d 1222, 1224 (5th Cir. 1980) (per curiam).[12]

As noted above, the GO has a burden of production to offer prima facie evidence sufficient for a reasonable person to conclude that Florida spent JTPA funds unlawfully. *See* 20 C.F.R. § 627.802(e); *Tex. Dep't of Commerce*, 137 F.3d at 332. The record, Florida argues, does not support such a conclusion, and in any event it presented evidence sufficient to defeat any prima facie showing. We disagree. JTPA § 165(a)(1) requires grant recipients to keep records sufficient "to permit the tracing of funds to a level of expenditure adequate to insure that the funds have not been spent unlawfully." 29 U.S.C. § 1575(a)(1) (1999). Thus, the GO could make a prima facie case by establishing the inadequacy of Florida's records. *See Tex Dep't of Commerce*, 137 F.3d at 332; *State of La.*, 108 F.3d at

---

[12] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

617-18. Here, the ID and FD consistently stated that Florida had not provided documentation sufficient to show that JTPA funds were spent in accord with § 141(b); that is, that JTPA funds were used specifically to cover costs incurred by Title III eligible students for services not already available to those students by virtue of other funds. The ARB identified substantial evidence to support this conclusion, including: (1) Florida's admission in response to the audit that "PBIF was never intended to fund special services for any sub-set of its clientele"; (2) testimony from PBIF director Steve Campora that PBIF was not designed to document any additional services provided to Title III dislocated workers and that he did not know whether additional services provided to Title III participants were ever "quantified"; (3) testimony from PBIF administrator Lenny Larson that Florida simply did not try to distinguish between Title III eligible persons and other participants in providing services, or to quantify services provided to the Title III participants; (4) testimony from Robert O'Leary, who helped design PBIF, that higher payments were made for providing a service to a Title III dislocated worker than for providing the same service to a general student; and (5) testimony from Linda Hartnig, who helped implement PBIF, that there was no documentation that additional services were provided to Title III participants. As the ARB further recognized, the GO's determination that Florida's records were inadequate to show compliance with JTPA § 164(a)(2)(A) was based on similar reasoning: if there was

21

"no apparent distinction" between Title III eligible students and general students with respect to services, and those services were already covered by state appropriated funds, then the "costs" to which JTPA funds were applied were not "necessary and reasonable" under § 164(a)(2)(A). *See* 29 U.S.C. § 1574(a)(2)(A) (1999).

In response, Florida challenges the predicate that state appropriated funds covered all relevant costs. Even if Title III eligible students received the same "services" as general students, Florida contends, "the actual costs of instruction that tuition did not cover exceeded the state's annual appropriation[,] because more JTPA Title III eligible students were served due to the PBIF program during the three years at issue than were served prior to the initiation of PBIF." To that extent, Florida argues, Title III students did receive a service "in addition to" what would have otherwise been available, and the costs covered by JTPA funds were "necessary and reasonable." DOL concedes that, "[t]o the extent . . . community colleges and vocational education schools incurred additional non-tuition costs for over-cap students, Florida might be able to claim a proportional share of those costs attributable to JTPA-eligible students." However, DOL argues, Florida produced insufficient documentation of these costs. Indeed, the ARB found that Florida's evidence was "not sufficient or adequate to establish how much Title III student enrollment increased during the three year period," and did not show that

22

"any increased costs of instruction, over and above the amount of the state's annual appropriation, were specifically caused by an increase in the number of Title III students served because of the PBIF program." Florida disagrees, arguing the record shows that, during the years covered by the audit: (1) enrollments increased by several thousand, nearly doubling, with placements and completions increasing as well; (2) 3,000 additional economically disadvantaged students were served each year, due to PBIF; (3) by DOL's own count, there were over 13,000 new JTPA enrollees, who cost (theoretically) $38 million per year based on FTE costs; and (4) PBIF certified courses increased from 179 at 39 institutions to 238 at 47 institutions. However, the ARB cited record evidence indicating that there was an unresolved conflict between Florida's enrollment figures and OIG's enrollment figures, which showed that Title III enrollments actually decreased between the first and second years of PBIF.[13] Although Florida submitted a table indicating the degree to which non-tuition costs of instruction attributable to "Group 3" students exceeded the FTE cap on state appropriated funds, Linda Hartnig testified that "Group 3" was not limited to Title III eligible students, but rather included all adult vocational students. Hartnig conceded that she could not specifically attribute the unfunded FTEs to Title III students. Robert O'Leary testified that he "anticipated"

---

[13] Notably, the ALJ's opinion indicates that Florida, unlike DOL, "counted multiple performances by students such as dual enrollments or placements."

and "expected" that Title III students would incur additional costs, but could not point to any documentation showing that such costs were actually incurred. Similarly, Lenny Larson could not "quantify" any additional costs incurred to recruit Title III students.

Any lack of documentation is irrelevant, Florida argues, because the following safeguards incorporated into PBIF rendered it "incapable" of violating JTPA requirements: (1) state appropriations were not reduced because of JTPA funding; (2) PBIF payments were designed never to exceed actual costs of instruction; (3) PBIF prohibited payment until a school exceeded pre-PBIF performance; (4) PBIF prohibited payment until a school exhausted its annual state appropriation; and (5) JTPA payments were authorized only to reimburse for JTPA certified programs and on behalf of JTPA qualified students.[14] The ARB, however, cited record evidence that schools "purchased equipment and services that they couldn't directly relate to JTPA with the proceeds from PBIF[,] which was substantially funded by JTPA . . . ." Lenny Larson testified that the PBIF incentive payments essentially "reversed" costs for services already rendered, and could be used in "whatever fashion" a school desired, so long as the expenditures were for a

---

[14] At oral argument, Florida's counsel stated that, under the statute authorizing PBIF, no JTPA funds could be provided to a school for JTPA students unless it could be demonstrated that they were for high wage/high skill positions. However, counsel could not identify any specific record evidence establishing that PBIF actually functioned in this way.

workforce program.  Similarly, Steve Campora testified that schools could use PBIF money anywhere in post-secondary vocational education.[15]  As the ARB indicated, such expenditures appear contrary to JTPA § 164(a)(2)(C), which prohibits the use of JTPA funds to cover "a general expense required to carry out the overall responsibilities of State . . . governments, except as specifically provided by this chapter."  29 U.S.C. § 1574(a)(2)(C) (1999).

For the reasons stated, the ARB's determination–that the GO met its burden of production to offer prima facie evidence of unlawful expenditures, and that Florida failed to carry its burden of persuasion to establish that the expenditures were ultimately lawful–is supported by substantial evidence.  Although, as the ARB acknowledged, Florida was not required to produce documentation tracing each JTPA expenditure to "a specific, identified individual," *Tex. Dep't Commerce*, 137 F.3d at 332, funds must still be traceable "to a level of expenditure adequate to insure that the funds have not been spent unlawfully."  29 U.S.C. § 1575(a)(1) (1999).  "Unless the burden of producing the required documentation is placed on recipients, federal grantees would be free to spend funds in whatever way they wished and obtain virtual immunity from wrongdoing by failing to keep

---

[15] For example, the ALJ noted the PBIF funds were used to purchase "mannequins, cars, or ammunition which were not necessarily used by the JTPA participants who generated the payment."

25

required records." *Montgomery County v. Dep't of Labor*, 757 F.2d 1510, 1513 (4th Cir. 1985).

C.    *Shifting Theories*

Florida also contends that the ARB decided this case on a theory different than that presented by DOL at the administrative hearing before the ALJ, and therefore deprived Florida of due process. "We review constitutional challenges to agency orders *de novo*." *See Ala. Power Co. v. FCC*, 311 F.3d 1357, 1367 (11th Cir. 2002).

"The fundamental fairness inherent in administrative due process cannot permit [an administrative official] to plead a certain charge, insist at hearing that only that charge is being litigated, and then raise a related, but more onerous charge only after the hearing record is closed." *NLRB v. Homemaker Shops, Inc.*, 724 F.2d 535, 544 (6th Cir. 1984); *see* 5 U.S.C. § 554(b)(3) (requiring, under the Administrative Procedure Act ("APA"), that a person entitled to notice of an agency hearing be informed of "the matters of fact and law asserted"); *Bendix Corp. v. FTC*, 450 F.2d 534, 542 (6th Cir. 1971) ("This court repeatedly has held that an administrative agency must give a clear statement of the theory on which a case will be tried."); *Rodale Press, Inc. v. FTC*, 407 F.2d 1252, 1256 (D.C. Cir. 1968) ("[I]t is well settled that an agency may not change theories in midstream without giving respondents reasonable notice of the change."). At the outset of the

administrative hearing in the instant case, Florida claims, "DOL counsel took the position on the record that 'the entire disallowance' was premised on the theory that Florida 'had committed itself by statute to cover the costs' beyond tuition." By doing this, Florida contends, "DOL made it clear that the adequacy of documentation was not an issue." Thus, Florida argues, the ARB deprived Florida of due process and violated the APA when it reversed the ALJ on the basis of insufficient documentation.

In response, DOL points out that the ID and FD warned from the beginning that Florida had not presented sufficient documentation to establish compliance with JTPA §§ 141 and 164. This does not matter, Florida argues, because like the Complaint Counsel in *Bendix*, DOL counsel limited DOL to a different theory of disallowance at the administrative hearing. *See Bendix*, 450 F.2d at 541. Specifically, Florida points to several exchanges between DOL counsel and the ALJ that occurred during DOL counsel's opening statement. Counsel asserted that Florida had obligated itself under Fla. Stat. § 239.117 to calculate and provide for non-tuition educational costs incurred by all students. Thus, counsel argued, "there was no justification for using governor's reserve JTPA funds for payments to Florida schools where they were pegged to costs that the state had already committed itself by law to bear." Shortly thereafter the ALJ asked whether, if counsel's statutory interpretation was incorrect and the costs were not covered

through lottery funds or general revenues, counsel's analysis would still apply in the same way. Counsel responded: "No, Your Honor. It would make a very real difference because if indeed, there was no obligation on the part of the state to educate those citizens, but for the availability of JTPA funds, then the facts would be contrary to the disallowance of the eleven point four million dollars." The ALJ then asked whether, if Florida's opposing interpretation of § 239.117 was correct, DOL had a problem with the way Florida had documented or calculated costs (that exceeded those covered by tuition). When counsel responded that DOL had not looked at the case "from that standpoint," and had not made eligibility or cost analysis an issue, the ALJ restated his question: "Do I correctly understand then, that you are not concerned about the manner in which they documented those costs?" A confusing exchange followed, with counsel finally stating that, "at this point, I would not say that we have expressed such a concern."

While this colloquy does provide some support for Florida's argument, we are not persuaded that *Bendix* is instructive here. In that case, a complaint was made that Bendix Corporation's acquisition of Fram Corporation would violate numerous provisions of the Clayton and Federal Trade Commission Acts. *See Bendix*, 450 F.2d at 534-35. However, the Complaint Counsel then decided to drop several charged theories of illegality and reformulate his case, ultimately presenting only three theories of illegality to the Hearing Examiner. *See id.* at 535-

28

36. The Hearing Examiner rejected each of these theories, but the Federal Trade Commission (the "Commission") nevertheless found against Bendix on the basis of an entirely separate "toehold" theory of illegality. *See id.* The Commission's action violated the APA, the Sixth Circuit concluded, because the toehold theory "was never charged, raised, nor tried during the administrative hearing; never presented for consideration by the Hearing Examiner; and not raised as an issue or discussed by Complaint Counsel in the appeal to the Commission from the order of the Hearing Examiner dismissing the Complaint." *Id.* at 537. In the instant case, however, the very ID and FD that led Florida to seek an administrative hearing stated that Florida's documentation was insufficient to establish compliance with the JTPA. Likewise, in its motion for summary decision DOL argued that the documents submitted by Florida did not show that Title III participants had received any "additional" services. Thus, Florida did not lack pre-hearing notice that documentation was at issue.

Although Florida contends, based on the colloquy described above, that DOL nevertheless "limited" its theory of the case at the administrative hearing *solely* to a question of statutory interpretation, this claim is inconsistent with the remainder of the hearing record as a whole.[16] As is clear from the discussion in

_____

[16] Florida claims that to prevail, it needed only to show that (contrary to the claims of DOL counsel) Fla. Stat. § 239.117 did not obligate Florida to cover those educational costs for general students which were not encompassed by tuition. The crucial question for purposes of

part B, *supra*, there are numerous instances of testimony at the administrative hearing as to the absence or inadequacy of documentation establishing that Florida complied with JTPA §§ 141 and 164. In addition, towards the end of the hearing the ALJ asked DOL counsel whether there was "any value in implementing the JTPA" aside from the payment of tuition. Counsel responded that such value had not been "quantified" and that DOL had "continually expressed a willingness to receive documentation that would show that allowable expenses [and] costs were incurred," but that "[w]e have not to this point received any such documentation." When the ALJ, referencing his earlier statements, stated that he thought documentation of costs was not an issue, counsel responded that the documentation of costs was "certainly an issue in so far as Florida has asserted that there was extra effort made with respect to JTPA individuals," and that "no such costs have been supported at this time." Counsel for Florida, however, did not then object and

---

this case, however, is whether Florida *did* in fact appropriate state funds to cover non-tuition costs, *not* whether § 239.117 specifically required it to do so. While DOL has receded from the position that § 239.117 specifically created such an "obligation" on the part of Florida, all parties appear to agree that, during the years in question, Florida did in fact appropriate state funds annually (using the FTE formula, for example) to cover projected non-tuition educational costs for general students, up to a certain point. Thus, we need not address further Florida's arguments as to the proper interpretation of § 239.117. For similar reasons, Florida overstates the significance of DOL counsel's statement that "if indeed, there was no obligation on the part of the state to educate those citizens, but for the availability of JTPA funds, then the facts would be contrary to the disallowance of the eleven point four million dollars." While Florida focuses on the issue of statutory "obligation," the more important language, considering the record as a whole, is "but for the availability of JTPA funds"; i.e., to what extent would Title III eligible dislocated workers not have received training "but for the availability of JTPA funds?"

suggest that DOL had already limited its theory of the case, or claim that Florida should be permitted to introduce additional evidence as to documentation. Nor did Florida raise the matter in its post-hearing briefing. Furthermore, in its Statement of Exceptions to the ALJ's decision and briefing to the ARB, DOL repeatedly argued that the record evidence was insufficient (or insufficiently substantiated) to establish that JTPA eligible individuals received services, as a result of PBIF, that they would not have received otherwise.[17] Florida did not respond by raising due process or APA concerns, or by arguing that the ARB could not reach the matter of documentation.[18]

In light of the foregoing, the instant case is not one where the agency "change[d] theories in midstream," *Rodale Press*, 407 F.2d at 1256, or issued a final decision based on a theory not raised at the administrative hearing. *See Bendix*, 450 F.2d at 537; *Homemaker Shops*, 724 F.2d at 544. Thus, Florida has

---

[17] The ALJ stated in his decision that "[d]ocumentation of individual costs as they related to individual levels of student achievement . . . was not a focus of this proceeding." Again, as the ARB properly recognized, while the JTPA does not require that each expenditure be traced to a specific, identifiable individual, *see Tex. Dep't of Commerce*, 137 F.3d at 332, a recipient must still be able to produce evidence sufficient to establish that JTPA funds were not spent unlawfully. *See* Part B, *supra*. The ALJ's narrow reference to "individual costs as they related to individual levels of achievement" simply did not address the issue of documentation in this broader sense.

[18] Florida did argue that certain issues were "stipulated as issues not in dispute" before the ALJ, and that DOL should not be permitted to "resurrect" them before the ARB. While Florida identified several of these issues as "the increased number of eligible participants PBIF served, educated and trained," "enrollment of the eligible participants," and "the costs of educating the eligible population," the portions of the hearing transcript to which Florida cites do not in fact contain any "stipulations" on the part of DOL.

not shown that the ARB deprived it of due process. Even if a due process violation did occur, however, Florida would also have to show that "there would have been [a] difference in defending the action" under the theory urged at the hearing, as compared to the theory employed by the ARB. *See Bendix*, 450 F.2d at 541. Florida's conclusory statement that "the pre-trial witness and exhibit lists" show it "could have introduced testimonial and documentary evidence further detailing the additional services provided and the reasonableness of the costs" does not suffice to establish prejudice in this regard. Moreover, witnesses such as Linda Hartnig testified to Florida's *lack* of documentation in terms of the services specifically provided to JTPA Title III participants.[19]

## IV. CONCLUSION

For the reasons stated, we conclude that the ARB's construction of JTPA § 141(b) is entitled to deference, that substantial evidence supports the ARB's decision to reverse the ALJ and affirm the disallowance of $11,419,499 in JTPA funds, and that Florida has not established a due process violation. Accordingly, we deny Florida's petition and affirm the order of the ARB.

**AFFIRMED.**

---

[19] When confronted with the prejudice issue at oral argument, Florida's response was equivocal at best. Counsel declined to concede that there was no additional documentation to produce, but could not identify any such documentation either, and instead asserted that the answer would depend on the type of documentation DOL was seeking.