*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name:  09a0198p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

PAUL H. VOLKMAN,

                    *Petitioner,*

       *v.*

UNITED STATES DRUG ENFORCEMENT
ADMINISTRATION,

                    *Respondent.*

No. 08-3802

On Petition for Review of a Decision from the
United States Department of Justice,
Drug Enforcement Administration.
No. 06-45.

Argued:  March 12, 2009

Decided and Filed:  June 3, 2009

Before:  MARTIN and GILMAN, Circuit Judges; ZOUHARY, District Judge.[*]

_____

**COUNSEL**

**ARGUED:**  Kevin P. Byers, KEVIN P. BYERS CO., LPA, Columbus, Ohio, for Petitioner.  Tritia Lindsay Yuen, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.  **ON BRIEF:**  Kevin P. Byers, KEVIN P. BYERS, CO., LPA, Columbus, Ohio, for Petitioner.  Anita J. Gay, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

_____

**OPINION**

_____

BOYCE F. MARTIN, JR., Circuit Judge.  Paul Volkman applied for a federal registration to dispense controlled substances.  The Drug Enforcement Agency denied

---

[*]The Honorable Jack Zouhary, United States District Judge for the Northern District of Ohio, sitting by designation.

his application, concluding that Volkman's registration was not in the public interest. The DEA reached this conclusion based on its finding that Volkman's prior prescribing practices violated state and federal law. *Paul H. Volkman, Denial of Application,* 73 FR 30629-03, No. 06-46 (May 28, 2008). Volkman petitions this Court for review of the DEA's denial of his application. Because the DEA's determination is in accordance with law and is supported by substantial evidence, we DENY Volkman's petition.

I.

Volkman holds an M.D. and a Ph.D. from the University of Chicago. In 2003, after large medical malpractice settlements and judgments left him unable to purchase malpractice insurance, Volkman started working at Tri-State Healthcare, a pain clinic in Portsmouth, Ohio. Denise Huffman, who is not a physician or a healthcare professional, owned Tri-State and paid Volkman $5,000 a week to start. (Volkman says that he was never a Tri-State employee, and was, instead, an independent contractor.) As required by the Controlled Substances Act, Volkman applied for a DEA registration to prescribe controlled substances from Tri-State's office. The DEA granted his application.

Soon after he began working at Tri-State, pharmacists in the area started complaining to the Ohio State Board of Pharmacy about Volkman's prescribing practices. One pharmacist said that Volkman was "writing large quantities of narcotics and benzodiazepines" and that many of his patients were "prior problem patients" of a physician who had been convicted of drug trafficking. That pharmacist refused to fill any of Volkman's prescriptions. A second pharmacist complained that Volkman was prescribing "duplicate therapy of narcotics." Yet another told the Board that he was having "trouble" with Volkman's patients, and that they "smelled of beer and dope." These calls continued throughout the summer of 2003. Around the same time, Volkman applied to the Board for a "Terminal Distributor of Dangerous Drugs license"—a state license that allows a clinic to buy controlled substances and dispense them directly from the clinic. The Board inspected Tri-State's clinic and, despite the complaints, granted Volkman's application for the on-site distribution license.

Once Volkman had both a DEA registration and a state license, Tri-State, using Volkman's DEA registration number, started ordering dosage units of oxycodone and a combination of hydrocodone and acetaminophen. The volume of Tri-State's drug purchases was, compared to other practitioners, very large: During the last six months of 2003, Tri-State purchased more than twenty-eight times the amount of oxycodone purchased by the next largest Ohio-based practitioner. And in 2004, Tri-State was the largest practitioner-purchaser of oxycodone in the United States.

The DEA office in Columbus, Ohio also received complaints about Volkman. One pharmacist in Kenova, Ohio reported that Volkman was prescribing "numerous prescriptions for OxyContin and Percocet" in "very large" quantities. He reported that the customers with prescriptions from Volkman "were lining up outside" of his pharmacy to get them filled. The Columbus DEA office got a call from a fellow agent in Texas passing along a report from a drug distributor there that Volkman had ordered large quantities of combination hydrocodone and acetaminophen. In November 2003, an area physician called the DEA to report that "numerous" Volkman patients were seeking detoxification treatment because Volkman was prescribing excessive amounts of opiates such as OxyContin, Percocet, and hydrocodone. In response to these complaints, the DEA obtained pharmacy records and a list of all the scheduled drugs dispensed under Volkman's prescriptions.

Later in 2003, Tri-State moved its clinic to a new location. The move triggered another inspection by the Ohio Board of Pharmacy. This time, the state agent inspecting Tri-State found several violations, including incomplete records and dispensing logs. He also noted some remarkable differences between Tri-State and "your normal doctor's office," including a Glock handgun, two night sticks and a four-foot club with leather straps—all in the area where the clinic dispensed drugs. The agent also observed that the clinic's owner appeared "over medicated" and received reports that sometimes twenty to thirty cars were lined up outside the clinic. All this led the state agent to suspect that Volkman was running a "prescription mill." But this suspicion did not induce the Board to withhold the clinic's state license; instead, it issued the license on

Feburary 4, 2004, after Volkman sent a letter stating that Tri-State was "in compliance with all issues."

There was little activity on the part of the DEA or the Ohio State Board of Pharmacy for the following year and half until June 7, 2005 when the DEA executed a search warrant at Tri-State and seized controlled substances, patient records, invoices, DEA forms, and financial records. One DEA investigator interviewed Denise Huffman, who reported that the clinic was a "full cash business," charging $200 for an office visit. Huffman said that her daughter, Alice Huffman, and Volkman "were in complete control of the dispensing center." Alice Huffman confirmed this and provided the agent with the names of two Tri-State patients who had died from drug overdoses. She also admitted that she was supposed to "keep the records," including dispensing logs, but did not and was not sure if inventories existed at all, nor whether any records that might exist would be accurate. The DEA agents tried to take an inventory of the drugs they seized by checking Tri-State's dispensing logs against records from the drug distributors. But the agents did not find any initial or biennial inventories of the drugs, nor any dispensing logs for the year 2004. According to the DEA, the clinic could not account for over one million products or tablets of the audited controlled substances. Denise Huffman later produced logs for 2005, but admitted that there were no records for 2004.

Volkman continued working at Tri-State for a few months after the raid, but then quit and started seeing patients out of his apartment. In October 2005, the Portsmouth Police Department executed a search warrant there and seized Volkman's patient files. The Department never filed any charges but issued a condemnation notice for the apartment.

Volkman then moved about an hour north to Chillicothe, Ohio and applied to modify his DEA registration to reflect this new location. Some four months later, DEA investigators obtained a search warrant for the Chillicothe clinic, which they executed on February 10, 2006 by, according to Volkman's brief, sweeping in "with helicopters, guns, and masked agents" in a "shock and awe raid." Three days later, the DEA served Volkman an Order to Show Cause, informing him that his DEA registration to distribute

controlled substances would be suspended immediately under 21 U.S.C. § 824(d) because his continued registration constituted "an imminent danger to the public health and safety." The next day, Volkman filed a written request for an expedited hearing and asked for full access to his records. He later applied for a renewal of his DEA registration.

Volkman's DEA hearing started on December 5, 2006 and continued until December 8. On December 8, the hearing was adjourned and resumed on January 9, 2007. Among other witnesses, two physicians, L. Douglas Kennedy and Wayne Wheeler, testified as experts on behalf of the DEA. Volkman testified in his defense, as did a former Tri-State employee and two employees who worked for Volkman after he left Tri-State. Both sides also submitted written evidence to the administrative law judge.

The administrative law judge issued her recommendation in June 2007. She found that Volkman unlawfully prescribed controlled substances, failed to adequately monitor patients, which directly contributed to the deaths of at least sixteen patients, improperly dispensed controlled substances, did not maintain adequate records or inventories, and repeatedly refused to take responsibility for his behavior. She recommended revocation of his DEA registration and denial of any pending applications.

The DEA Deputy Administrator reviewed the evidence and the administrative law judge's recommendations and concluded that granting Volkman's application for a new registration[1] would be "inconsistent with the public interest," in contravention of 21 U.S.C. § 823(f), based on Volkman's "experience in dispensing controlled substances," his lack of compliance with state and federal law relating to controlled substances, and "other conduct which may threaten the public health and safety." The Deputy Administrator also considered and rejected Volkman's claims that he was denied

---

[1]Volkman's registration that was in effect at time it was suspended expired before his hearing. Consequently, the DEA considered his appeal as an application for a new registration, which is evaluated by the same criteria as a revocation of an existing registration. 21 C.F.R. § 1301.51.

due process and that the decision was in conflict with the Supreme Court's decision in *Gonzales v. Oregon*, 546 U.S. 243 (2006). Volkman petitions this Court for review.

## II.

The Deputy Administrator's factual findings are conclusive if they are supported by "substantial evidence." 21 U.S.C. § 877. The Administrative Procedures Act provides the applicable standard of review for the Deputy Administrator's exercise of discretion. *Hoxie v. DEA*, 419 F.3d 477, 482 (6th Cir. 2005). Thus, this Court will set aside a revocation of a DEA certificate if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* (quoting 5 U.S.C. § 706(a)(2)). The record must reflect "a rational connection between the facts found and the choice made." *Id.*

## III.

Volkman challenges the denial of his application for DEA registration on several grounds. First, he argues that the DEA's adjudication denied him due process by providing him inadequate notice and opportunity to be heard. Next, he contends that the DEA's denial of his Controlled Substances Act registration is unlawful because it is an impermissible determination of what is "legitimate" medical practice by a federal agency that lacks the expertise or authority to make such a determination. The DEA's denial of his registration, he argues, was an unauthorized attempt to "define the substantive standards of medical practice" in violation of the Supreme Court's decision in *Gonzales v. Oregon*, 546 U.S. 243 (2006). Finally, he argues that the DEA's factual determinations are not supported by substantial evidence. We consider each of these arguments.

### *A. The DEA adjudication satisfied due process requirements*

The Due Process Clause forbids an agency from using evidence in a way that forecloses an opportunity for a party to offer a contrary presentation. *Bowman Transp. v. Arkansas-Best Freight Sys.*, 419 U.S. 281, 289 n.4 (1974). In addition, the Administrative Procedures Act, which provides the procedures for agency adjudication,

states that "[p]ersons entitled to notice of an agency hearing shall be timely informed of—(1) the time, place, and nature of the hearing; (2) the legal authority and jurisdiction under which the hearing is to be held; and (3) the matters of facts and law asserted." 5 U.S.C. § 554(b). The DEA's regulations further require that an Order to Show Cause contain "a summary of the matters of fact and law asserted." 21 C.F.R. § 1301.37(c).

Volkman's procedural attack focuses on his notice of the charges against him. He argues that "the record from the agency proceeding exhibits a shocking litany of new charges, modified charges, reduced charges, enhanced charges, newly-identified patients, unidentified patients, new evidence, suspicious evidence, no evidence, hearsay, rampant speculation, and wholly irrelevant and prejudicial testimony." More specifically, he argues that the DEA presented evidence at the hearing that "grossly exceeded the scope of the February 2006 show cause order."

The Order to Show Cause alleged that eleven of Volkman's patients had died from the effects of drugs that Volkman had prescribed. Although the Order itself did not identify the names of the patients, the DEA provided those names in its March 2006 pre-hearing statement. As the hearing approached, the DEA indicated to Volkman that it did not intend to introduce patient files into evidence, yet the DEA delivered nine patient files to Volkman's counsel four days before the hearing convened. Among these files were the six patient files ultimately reviewed by the DEA's expert, Kennedy. One of the patients included in the case, Charles Robert Jordan, was not included in the Order to Show Cause. Although initially Volkman had only four days to review the files and prepare for the hearing after the DEA had provided him with the patient files supporting its expert's testimony, the administrative law judge adjourned the hearing for approximately one month and also allowed Volkman to defer his cross-examination until then.

Volkman also complains that "at the hearing itself, the government witnesses brought forth information, without a single chart in evidence, about at least twenty-five patients." Volkman maintains that he "could never be certain how many patients were at issue, who the specific patients were, what their charts showed or did not show, and

what criticisms were being leveled at him." The DEA Deputy Administrator considered this argument, and, after finding that Volkman did not preserve it because he did not provide "specific and complete citations of the pages of the transcript," observed that she nonetheless did not rely on this portion of the evidence. Thus, even if the administrative law judge erred by admitting certain exhibits, the error was not prejudicial because the Deputy Administrator did not rely on the exhibit with additional patients in reaching her determination.

Volkman compares the DEA's treatment of his case to the Federal Trade Commission's handling of a charge in *Bendix Corp. v. F.T.C.*, 450 F.2d 534 (6th Cir. 1971). In *Bendix*, this Court vacated the FTC's decision and remanded because the Commission "decided the case on a theory of illegality which was never charged, raised, nor tried during the administrative hearing; never presented for consideration by the Hearing Examiner; and not raised as an issue or discussed in the appeal," *id.* at 537, thus denying Bendix "notice . . . [and an] opportunity to present evidence in defense." *Id.*

The case against Volkman bears no resemblance to the procedural violations in *Bendix.* Here, among other allegations, the Show Cause Order specifically alleged that Volkman had prescribed multiple controlled substances to persons who, within days, died from overdoses of the drugs. It also alleged that he was ordering excessive quantities of controlled substances, far more than his peers, and that Volkman did not perform physical examinations or keep proper dispensing records. These were the same theories that the DEA advanced throughout the proceedings against Volkman, including at the hearing before the administrative law judge. The specificity and detail of the Show Cause Order, as clarified by the pre-hearing brief, provided Volkman with notice with the nature of the DEA's case. Indeed, unlike in *Bendix*, Volkman knew from the beginning the nature of the DEA's basis for suspending and later denying his registration to distribute controlled substances. Moreover, the administrative law judge adjourned the hearing to provide Volkman ample time to review the specific patient files that supported the government's case. And at the hearing, Volkman's counsel was able to cross-examine the DEA's witnesses and probe their testimony for weaknesses. We

therefore conclude that the agency adjudication was procedurally adequate and provided Volkman with a "meaningful opportunity" to prepare and present his defense.

### B. The DEA's denial of Volkman's registration was authorized by the Controlled Substances Act

We next consider Volkman's challenge to the DEA's denial of his registration against the backdrop of the Controlled Substances Act and the Supreme Court's decision in *Gonzales v. Oregon*, 546 U.S. 243 (2006).

A "main objective" of the Controlled Substances Act is controlling "illegitimate traffic in controlled substances," by placing "substances in one of five schedules based on their potential for abuse or dependence, their accepted medical use, and their accepted safety for use under medical supervision." *Id.* at 250. "To prevent diversion of controlled substances with medical uses, the CSA regulates the activity of physicians. To issue lawful prescriptions of Schedule II drugs, physicians must 'obtain from the Attorney General a registration issued in accordance with rules and regulations promulgated by him.'" *Id.* (quoting 21 U.S.C. § 822(a)(2)).

Under the Controlled Substances Act, the DEA may deny an application for a practitioner's registration upon a determination "that the issuance of such registration would be inconsistent with the public interest." 21 U.S.C. § 823(f). In determining whether a registration is in the public interest, the Attorney General "shall" consider these factors:

    (1)    The recommendation of the appropriate State licensing board or professional disciplinary authority.

    (2)    The applicant's experience in dispensing, or conducting research with respect to controlled substances.

    (3)    The applicant's conviction record under Federal or State laws relating to the manufacture, distribution, or dispensing of controlled substances.

    (4)    Compliance with applicable State, Federal, or local laws relating to controlled substances.

    (5)    Such other conduct which may threaten the public health and safety.

§ 823(f). The Deputy Administrator, on behalf of the Attorney General, must consider each factor, though he need not make explicit findings as to each one and can "give each factor the weight [he] determines is appropriate." *Hoxie*, 419 F.3d at 482.

Volkman attacks the lawfulness of the DEA's denial of his registration by relying on *Gonzales*. That case concerned a dispute that arose after Oregon enacted the Oregon Death with Dignity Act, which legalized physician-assisted suicide. *Gonzales*, 546 U.S. at 249. In response, Members of Congress, "concerned about [the assisted-suicide act] invited the DEA to prosecute or revoke the [Controlled Substances Act] registration of Oregon physicians who assist suicide." *Id.* at 252. The Attorney General concluded that the Controlled Substances Act did not authorize the DEA to "displace the states as the primary regulators of the medical profession, or to override a state's determination as to what constitutes legitimate medical practice[.]" *Id.* (quoting Letter from Attorney General Janet Reno to Sen. Orrin Hatch, on Oregon's Death with Dignity Act (June 5, 1998)). But in 2001, the new administration's Attorney General issued an Interpretive Rule that announced his intention to stop Oregon physicians from using controlled substances in physician-assisted suicide. *Id.* at 254. He ruled:

> [A]ssisting suicide is not a 'legitimate medical purpose' withing the meaning of 21 CFR 1306.04 (2001), and that prescribing, dispensing, or administering federally controlled substances to assist suicide violates the Controlled Substances Act. Such conduct by a physician registered to dispense controlled substances may 'render his registration . . . inconsistent with the public interest' and therefore subject to possible suspension or revocation under 21 U.S.C. 824(a)(4). The Attorney General's conclusion applies regardless of whether state law authorizes or permits such conduct by practitioners or others and regardless of the condition of the person whose suicide is assisted.

*Id.* (quoting 66 Fed. Reg. 56608 (2001)). The state of Oregon, joined by a terminally ill patient, a physician, and a pharmacist, challenged the Interpretive Rule. The Ninth Circuit Court of Appeals affirmed the district court's permanent injunction against its enforcement. The Supreme Court affirmed, holding that the Controlled Substances Act does not give the Attorney General the authority to "define general standards of medical practice." *Id.* at 275. The Court explained that the Interpretive Rule on assisted suicide

was not authorized by the Controlled Substances Act because it was not based on the "public interest" factors described in 21 U.S.C. § 823(f), but was instead the Attorney General's own judgment on a controversial practice, without regard to state law. *Id.* at 263-64. While recognizing the limits on an agency's discretion to decide whether "a physician who administers any controversial treatment could be deregistered," *id.* at 262, the Court nevertheless affirmed that "Congress regulates medical practice insofar as it bars doctors from using their prescription-writing powers as a means to engage in illicit drug dealing and trafficking." *Id.* at 246.

Here, by contrast, the Deputy Administrator explicitly applied the 21 U.S.C. § 823(f) factors and made an individualized determination that issuing a Controlled Substances Act registration to Volkman would not be in the public interest. Volkman argues that the Attorney General may not "pass judgment upon the medical care [Volkman] rendered." But the DEA did no such thing: It did not deny Volkman's application because of a disagreement over the best way to treat chronic pain sufferers, nor did it deny his application because he purchased very large quantities of controlled substances compared to his colleagues. The Deputy Administrator's assessment of Volkman's prescribing and record-keeping practices was tethered securely to state law (the Ohio regulations on the management of intractable pain) and federal regulations (the Controlled Substance Act's record-keeping requirements) in the context of evaluating the Section 823(f) factors. Indeed, it was Volkman's lack of compliance with state *and* federal law that led the Deputy Administrator to conclude that the factors described in Section 823(f) weighed against approving Volkman's registration. Thus, unlike the Interpretive Rule at issue in *Gonzales*, the DEA's denial of Volkman's registration was consistent with the Controlled Substances Act's "recognition of state regulation of the medical profession," 546 U.S. at 272, and its bar on physicians "from peddling to patients who crave [] drugs for [] prohibited uses." *Id.* at 274.

### C. Substantial evidence supports the Deputy Administrator's determination

In considering Section 823(f), the Deputy Administrator concluded that the second (experience in dispensing controlled substances), fourth (compliance with state and federal laws), and fifth factors (other conduct that threatens public health and safety) "amply demonstrate" that granting Volkman's application for registration would be "inconsistent with the public interest." The Deputy Administrator considered factors two and four together and found that "the evidence conclusively establishes that [Volkman] used his prescribing authority to act as a drug pusher." Specifically, the Deputy Administrator determined that Volkman did not comply with Ohio law in prescribing controlled substances, and we find that substantial evidence supports this decision. For example, Ohio law provides criteria for those prescribing drug treatment for "intractable pain." The practitioner "shall" perform:

> [A]n initial evaluation of the patient . . . documented in the patient's record that includes a relevant history, including complete medical, pain, alcohol and substance abuse histories; an assessment of the impact of pain on the patient's physical and psychological functions; a review of previous diagnostic studies and previously utilized therapies; an assessment of coexisting illnesses, diseases or conditions; and an appropriate physical examination;

Ohio Admin. Code R. § 4731-21-02(A)(1). But the investigating DEA agent found that there was no documentation of a physical exam in 900 of the more than 1,200 patient files seized in the raids. Kennedy, the DEA's expert, also concluded that Volkman conducted an inadequate history and physical examination of the patients who died after receiving prescriptions from Volkman. Although Volkman introduced evidence that he performed an initial physical exam on one of the six patients whose files were reviewed by Kennedy, he did not introduce evidence to support the contention that he examined any of the five others. And this is despite Volkman's access to those patient files and his testimony that he always documented his findings.

Ohio law also instructs practitioners to refer patients to specialists for evaluation:

> The practitioner's diagnosis of intractable pain shall be made after having the patient evaluated by one or more other practitioners who specialize in the treatment of the anatomic area, system, or organ of the body perceived as the source of the pain.

Ohio Admin. Code R. § 4731-21-02(A)(1). Kennedy testified that "[t]here was seldom any diagnostic testing or past medical record present," nor "plan[s] to diagnose or treat the problem." Volkman did not introduce evidence to contradict this conclusion, with the exception of one patient who was referred to Cleveland Clinic.

Volkman's testimony about the role of opiates in pain-management does not alter the conclusion that he was not in compliance with Ohio law. Nor does the testimony of two employees who worked for him after he stopped working at Tri-State support his argument, because they could not refute the evidence that Volkman violated Ohio's pain management regulations while he was working at Tri-State. Although Volkman testified that he documented his diagnoses "at all times" and "always wrote my justification and my thinking as to why I put patients on certain medicines," the administrative law judge made a finding that she "doubt[ed Volkman's] credibility" with respect to his testimony regarding his treatment practices because "[n]either Dr. Wheeler nor Dr. Kennedy testified about finding such safeguards in the patient charts they reviewed" for the hearing. The Deputy Administrator adopted the administrative law judge's credibility findings, though acknowledged that there was evidence that Volkman had, in at least one case, performed a physical exam. Besides his own testimony, which the administrative law judge found to be incredible, Volkman did not introduce any evidence to support his contention that he followed the Ohio regulations on pain-management practice.

Moreover, Volkman's noncompliance with Ohio law was not the only ground the Deputy Administrator relied on in concluding that his registration would not be in the public interest. She also determined that Volkman did not keep proper records for controlled substances that were ordered and dispensed under his registration. The Controlled Substances Act requires all prescription-dispensing entities to conduct a biennial inventory of all of the controlled substances it has on hand and to "maintain, on

a current basis, a complete and accurate record of each [controlled] substance" that it has "received, sold, delivered, or otherwise disposed of." 21 U.S.C. § 827(a)(1), (3).

Substantial evidence also supports the Deputy Administrator's conclusion that Volkman's record-keeping did not satisfy these standards. As early as 2003, a state inspection revealed that Tri-State had not made any entries in several controlled substance dispensing logs in more than four months. Two years later, during a raid of Volkman's practice, DEA investigators could not find any dispensing logs for the year 2004, despite the fact that these logs should have been maintained for two years. *See* 21 U.S.C. § 827(b). Although Tri-State later provided a log for 2005, it provided the log only after the DEA returned the patient files, and the Deputy Administrator noted the dubious authenticity of the log because it appeared "brand new."

The Deputy Administrator also found that the record-keeping violations were "aggravat[ed]" by the "extraordinary quantities of various highly abused controlled substances" that Volkman ordered. He was, at times, the largest practitioner-purchaser of oxycodone in the nation, and the DEA's 2005 audit revealed that Volkman could not account for thousands of dosage units. The Deputy Administrator's finding that Volkman "authorized the ordering of large quantities of numerous controlled substances, and that the disposition of these drugs cannot be adequately accounted for because [he] failed to maintain accurate records," is thus supported by substantial evidence. Consequently, the Deputy Administrator properly concluded that Volkman was not complying with federal regulations requiring dispensers of controlled substances to maintain accurate and up-to-date records. *See* 21 U.S.C. § 827(b).

In sum, the Deputy Administrator considered the Section 823(f) factors in determining whether Volkman's Controlled Substances Act registration was in the public interest. Based on her finding that Volkman did not comply with Ohio regulations governing pain management and did not follow federal record-keeping regulations, she concluded that the Section 823(f) factors weighed against issuing Volkman a new CSA registration. This determination was supported by substantial

evidence and was within the scope of authority granted by the Controlled Substances Act.

IV.

The DEA's denial of Volkman's registration did not exceed the Attorney General's authority under the Controlled Substances Act and the determination was supported by substantial evidence.  We therefore DENY Volkman's petition for review.